We're ready for argument in United States v. Cervantes et al. And counsel may begin whenever you're ready. Thank you, Your Honor. Amitai Schwartz appearing on behalf of Jaime Cervantes. I'll be dividing argument with Karen Landau, who represents Henry Cervantes. We would like to jointly request six minutes for rebuttal. You'll have to help keep track of your time. We will. Thank you. What I intend to do is I intend to discuss the obstruction of justice convictions against my client and Henry Cervantes. Those are counts seven and nine. I'll also touch on count ten, which is the use of fire to commit a felony, which pertains to Jaime Cervantes. And then I'll just briefly touch on some of the sentencing issues that pertain to my client, Jaime Cervantes. Ms. Landau will address the broader question of the admissibility of the testimony by former correctional officer Feeney. And she will also address some sentencing issues pertaining to her client, Henry Cervantes. With regard to the obstruction counts, the facts are clear what happened here. Mr. Cervantes, that is Jaime Cervantes, and forgive me if I don't use his first name. I'm going to try very hard to do that. Jaime Cervantes, along with a confederate, burned the body of two persons who Henry Cervantes had killed the day before. The United States contended that by burning those bodies, Henry and Jaime had obstructed a federal grand jury. It's our contention that a federal grand jury, under the facts of this case, was not foreseeable as to that the burning of bodies would necessarily lead to the convening or an investigation by a federal grand jury. Let me ask you a question. It was a part of your argument that interested me. It strikes me that the two people involved were known to the police, and they get a double homicide, and your argument is that the prosecution wouldn't be interested in bringing that case as soon as they had enough evidence to the grand jury. I find that rather remarkable, and I'd like to know your argument of why that is. Of course, there was no evidence taken, so it's speculation, I suspect, to prove that it wouldn't happen. What's the evidence, what's the background, what's the basis of your argument, especially when your client, I guess it's your client, I've lost track, I don't have my notes in front of me, but is out on close warrant watch. Why couldn't you assume that would happen? Well, first off, my client was not on supervisor's release. He had not been convicted of a federal crime previously. He had been convicted of three California misdemeanors. He's under supervision. He's released under supervision? No, he's not. That's Henry Cervantes, Your Honor. Thank you for clarifying that. My client was the low guy of this group. He was the Norteno, he was the youngest guy. He'd had these three misdemeanors, but to answer your question directly, the issue is you have to look at it from the perspective of the defendant. Was it objectively foreseeable from the standpoint of the defendant that a federal grand jury would convene? Sure it was. Counselor, could I ask you to clarify your argument for me in the following way. Are you saying that it was foreseeable that there would be some police investigation, but that it might be a state and not a federal investigation? Is that your argument, or are you saying that he wouldn't have foreseen it at all? It's both. It's both. I must say I have difficulty saying that he wouldn't foresee somebody going after these murders. Well, yeah. I mean, they burned the bodies, so they clearly did it for some purpose. But the question, the first, in answer to your question, first off, this was a California case. These are California street guys, or at least Jaime Cervantes was a California street guy. He wouldn't necessarily, or it wasn't even likely that he would perceive that he would be, that a federal grand jury, whatever that is, would be indicting him for this crime. He certainly could conceive that there would be an investigation. He could conceive that that investigation could end up in a court. But whether or not he could conceive that it would be a federal grand jury, as opposed to a California investigation, you have to keep in mind, Your Honor, that in California, the grand juries are used very seldomly. Under the California Constitution, a prosecutor can proceed by either a preliminary examination or by indictment by grand juries. Grand juries are used most commonly for political indictments, for police officer indictments, and so forth. But the regular street crimes, as bad as they are, ordinarily, in California, go to a preliminary hearing. And preliminary hearing has a judge there, correct? Oh, yes. And so it is a judicial hearing. It is. But that's not what was charged here. What was charged here was that they obstructed a federal grand jury. And my point is that most lay people, I mean, judges talk about grand juries. Judges and lawyers talk about grand juries. On your point that you seem to be suggesting that they needed to know that it might end up being a federal grand jury or a federal proceeding as opposed to a state one. Is that part of your argument? Yes, it is part of our argument. But I don't see how that fits with 1512 G1, which says in a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance, one, that the official proceeding before a judge, court, magistrate, judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a federal grand jury, or a federal government agency. That seems to negate that argument. So then we're back to just could they have seen that it would be some official proceeding and then we're left with the argument that they could expect that burning these bodies would be ignored? No, not at all. But the point is, as other circuits have decided in the Young case that we cited, in the Frisky case, that section that you just read, subsection G, does not foreclose a foreseeability issue. And that is it still has to be foreseeable. I mean, if judge... That could be a proceeding, but the federal part's out of it. And you can do this kind of a cover-up and not expect that there'll be any kind of a proceeding? Of course there would be. For the underlying murder? I've conceded that. But what I'm arguing is that they couldn't foresee... If judge Igular, who was a judge of the United States District Court of Northern California, could not foresee that lying to a FBI agent in 1994 or whenever it was, was going to go before a grand jury, it's hard to see how a street criminal is going to know that by burning these bodies. Or to use another example, suppose that instead of... We were talking instead of burning a body, we were talking about lying to a police officer. Suppose a Oakland police officer came and questioned him and he lied... Jaime Cervantes, and he lied to him. Under the government's theory here, he could be indicted for obstructing a federal grand jury because that Oakland police officer might be called before the grand jury to repeat what Mr. Cervantes said to him. So the problem here is that when you expand it to these kinds of circumstances, you're talking about what Judge Wilkinson in the Fourth Circuit described as statutory sprawl and what the Supreme Court of the United States has said over and over again, in Anderson, in Igular, in Fowler, in Marinello, where they talk about unifying principles. They talk about interpretive restraint. Counsel, before you run out of time, could you address the sentencing issue, please? Yes. With regard to the sentencing issue, regardless of what the court ultimately decides with regard to the merits of counts 7, 9, and 10, with regard to the sentencing issue, the government has conceded that our sentencing argument is correct, that Jaime Cervantes, that the district court had double counted the use of the firearm. The government comes back and says that the district court made a second error and that the second error was that the district court judge failed to apply the exception after the fact provision of the guidelines. And after a long calculation and going through the matrix, the government argues that the numbers come out the same. We are contending that the court should remand for re-sentencing. It should not just accept that recalculation because the recalculation goes to the weights given to the various groups. The recalculation goes to the actual number of groups. It goes from three to four. It rebalances the whole thing. It used to be that the predominant or the highest crime here was the Livermore Hobbs Act robbery. And now, after the government's recalculation, obstruction of justice becomes the highest category. And the question is, would the district court necessarily impose the same sentence? And I'm going to turn over my time to Ms. Landau. You may do that and we'll allow you to sort of trade off on rebuttal time if you'd like, so it doesn't have to be you that has the two and a half minutes when the time comes. We appreciate that. Be fine. May it please the court. I'm Karen Landau and I represent Henry Cervantes. I'll be referring to him by his first name, given the many Cervantes in this case. Before I address the issues that I intended to argue, I'd just like to address, I believe it was Judge Wallace's question, about how it could be not foreseeable to my client, who was on supervised release, that there would be a grand jury investigation. And I would just point out again, he is a street criminal. He certainly knew that there would be an investigation and he was probably quite concerned about having his supervised release revoked. But the fact of a federal grand jury proceeding is something different. And I would just, again, as my co-counsel did, point the court to the cases, particularly Aguilar. If it's not foreseeable to a federal judge, I do not see how committing a street crime and covering it up is foreseeable to somebody like my client. But I don't want to belabor the point. I'm sure you've heard enough about that. So the principal issue that I've been tasked with arguing is the question of the lay opinion testimony that was admitted against all of the defendants. Counsel, let me just begin by making sure that we're on the same page. We review the ruling to permit Mr. Feeney's testimony for abuse of discretion. Yes, that's the standard of review, although it's abuse of discretion under Hinkson, which means if the court misapplied the law, then that is an abuse of discretion. Correct. Right. Right. So I think the critical question here is whether what we have here is a witness who certainly could have testified to some of what he testified to as lay opinion, but who overall gave opinion that fell under Rule 702. The testimony went beyond the scope of what the circuit has allowed in Gadsden. Gadsden, which is a plain error case, allowed an officer to testify as to the meaning of telephone calls that he reviewed, where those calls included ambiguous statements. But in this case, we have somebody who really had some firsthand perceptions, but mostly had perceptions that really he had specialized knowledge. And I'd like to stress that Rule 702 is intended to govern not just testimony that's limited to the scientific method, but also specialized knowledge. Mr. Feeney's testimony was based in large part on his specialized knowledge that he gained over many years at the BOP, but he was allowed to testify to a lot of that knowledge as lay opinion, and that circumvented the requirements of Rule 702. The fact of the lack of... What specifically would have made his testimony inadmissible had it been admitted under 702? Well, we don't know, Your Honor, because the 702 process wasn't followed. The judge said preliminarily that his testimony didn't qualify under 702 because he didn't have a reliable methodology. And so then the government said, well... I'm sorry, continue. Well, then the government said, well... And the court, frankly, invited the government to admit it under 701, and that's what the government did. The government stepped through the door that was open. But as a result, the government didn't have to qualify with the strictures of Rule 702. And presented, really, I mean, to argue that Feeney was... When you read the introductory questions, I mean, he was presented as an expert, even though there was... Counsel, this is... I guess what this goes to in my mind is sort of a two-pronged question about harmless error. Because if the government had been told, okay, this is 702 and not 701, and you're saying, well, he was an expert, it's hard to imagine how it would have been any different and potentially even more persuasive to a jury if he's called an expert. And just on the basic question of the actual testimony, which to a large extent seemed cumulative of other things in the case. So I guess I'd like you to address both of those aspects of potential harmless error analysis. Sure. Sure, Your Honor. I'd be happy to do that. So as to the first question, what you're suggesting is this would have come in if the 702 analysis had been performed. Well, we don't know that, and we can't speculate as to that. All we have is the court preliminarily ruling this isn't admissible under 702, or large parts of it aren't. And, you know, we really... I don't think it's not really fair to speculate, well, it would have come in anyway, because the foundation wasn't... Let me ask you, did counsel make an objection to coming in under 701? Oh, yes, Your Honor. They made those objections. I mean, they made objections opinion by opinion. On what was the basis of the objections? Well, there were a variety of objections. They were interposed question by question, because that's what the court required. And there were objections that it was expert testimony. There were objections that it relied on hearsay. There were objections of relevance, of speculation, a myriad of objections. Could you also address the other aspect? I would like to do that, Your Honor. So, yes, a lot of what he testified to, there was testimony, but all of it came from the most unsavory type of cooperating defendants and witnesses who were trying to curry favor. The only witness who was... I mean, we have Bismarck Ocampo, Mario Ochoa Gonzalez, and the other defendants charged in this case. They all stood to gain substantially from their testimony. They had serious credibility problems, lengthy criminal histories. Feeney had none of those, of course. He was a former Bureau of Prisons official. And I think the proof is in the pudding. The government relied heavily on his testimony. Another point is, his testimony comprised 20% of the entire trial, approximately 20%. I didn't actually run the data, but it's about 900 pages of about a 4,500 page trial transcript. Now, some of that was cross, but more than half was direct. And I think the energy and the time is somewhat convincing in terms of harmless error. Well, I guess... I'd like to move to the... Oh, I'm sorry. Let me quickly just ask one more thing about this, and then I apologize for taking your time on it, but it's a concern to me. The nature of the testimony is primarily about what is the meaning of coded language. And to use an example from another case, when we're talking about washing machines, we're really not talking about washing machines. Yes. Here it was t-shirts and colors. So, as to that kind of testimony, it seems to me that a jury might not be as skeptical about the other criminals who are testifying, as they might be when it's a discussion of where to lay the blame, who pulled the trigger, that sort of thing. But it seems to me that they would be viewed as credible on how they talk. So, I guess I have a little more difficulty than I might otherwise seeing how credibility plays into this. Well, perhaps, Your Honor, but that brings in another issue, which is that a lot of that testimony was critical to the drug quantities. Now, while my client was not convicted of any particular drug quantity, other defendants were. Right, but we're only talking here about Feeney's testimony. No, and I'm talking about that. And whether or never. And I'm talking about Feeney's testimony was a critical basis for drug quantity. Are you contending that with respect to drug quantity, he would have had to be an expert under 702? Not as to quantity, but as to the coded interpretations. But let me go back to your question. I understand what you're saying, but I still think his testimony was the most consistent. And the other defendants, the other witnesses, as I recall, there were different codes. And so, there was different testimony about this and that. So, his testimony tied it all together. Okay, I'm sorry I took you off track of wanting to discuss sentencing. I do want to spend a few minutes discussing Henry's sentencing. So, Henry was acquitted of conspiracy. He was acquitted of the special sentencing factor that charged conspiracy to commit the murder with malice aforethought of persons who opposed the Nuestra Familia, rival gang members, and there was another group, but it doesn't really matter. This precise language is not that important. He received, yet he was sentenced using the first degree murder guidelines. There are two principal issues here. First is, did his acquittal on most counts preclude his sentencing for first degree murder? And if that can be used, did the judge nonetheless err in using the first degree murder guideline and also use the wrong standard of proof? Because the judge used the standard of preponderance of the evidence, not clear and convincing evidence. I have addressed this in detail in my briefs, so if the court has any questions, I'd particularly like to focus on those. I mean, how do you get around the Mercado case? Well, Mercado preceded Pimentel-Lopez, and I think that in Mercado, as I recall, there was no special verdict acquitting the defendant of particular conduct. And obviously, here we have this special verdict. So yes, Mercado is a general holding following Watts that the court can consider, the sentencing court can consider acquitted conduct. But that's not the situation here. The court also has a line of cases which rule when there is a special verdict, it's controlling. I see that I'm almost out of time. So if there aren't further questions, I can see Judge Graver has a question. No, I was just going to say that, again, you have about another two and a half minutes. So between you, you have about five minutes. And it doesn't matter to the court whether you each use some of it or one of you uses all of it. It's for your side, however you wish to use it. Right, and if the court does not have further questions on this, I would like to reserve the rest of my time for rebuttal. Yes, you may do that. We'll hear from the government. Okay. May it please the court, Sangeeta Rao with the Department of Justice, on behalf of the United States. I intend to address the issues in the following order. The gang code, the obstruction issue, Henry's sentencing, and then Jaime's sentencing. Turning first to the admissibility of Feeney's testimony on gang code. This court has acknowledged that there is a fine line between lay and expert testimony in gang code cases. Here, the district court wanted to be very careful. It found that Feeney was an expert later in the trial. But it was very concerned that if Feeney was characterized as an expert in front of the jury, he would get too much credibility. So it made a decision to have the government have Feeney testify as a lay witness with foundation for every single opinion. The court said it would take it piece by piece. And it acknowledged that this would hurt the government much more than the defendant. Because if the government didn't have to put it in piece by piece, the testimony would have come in a lot quicker, a lot easier for the jury to understand. But instead, what Feeney did was testify based on his experience as an investigator. He had a lot of lay experience and firsthand observations. He was a BOP investigator and the point person for Nuestra Familia in the BOP system. He testified that he reviewed every NF-related letter or phone call uploaded to the BOP computer system from 2005 to 2013 as part of his job. That's at Joint Excerpts of Record 820. He reviewed two to three NF letters and two to five NF phone calls per day. He said, quote, at JER, Joint Excerpts of Record 811, we would be listening to calls playing in the background all day long. The indictment alleged a conspiracy starting in 2003. And much of the conduct of trial occurred from 2009 to 2013, which spans the time that Feeney in real time was monitoring NF gang members, including the defendant. So Feeney's investigation was simply commensurate with the scope of the offense. Feeney also had daily contact with Skip Villanueva, a co-conspirator referenced as the second overseer in paragraph 15 of the indictment, for years. And he had personally interacted with Andrew, and he could recognize their voices and their handwriting. He had also participated in searches of cells and recovered gang photos and ciphers. The district court repeatedly required the government to establish that Feeney's knowledge derived from this investigation. So even if he had other information, he was required in this trial to testify about his lay opinion testimony related to this investigation. Although the defendants contend his testimony depended on hearsay rather than personal observations, there is no support for that in the record. To the contrary, the district court specifically found that Feeney's testimony was, quote, that he himself conducted the investigation, that he himself listened to these calls, and that he himself made the determinations that he did. Also, the court ensured that the jury had the proper framework for evaluating Feeney's testimony through its jury instructions. The court instructed the jury a couple of times during his testimony that Feeney was simply giving his opinion of the evidence based on the investigation, that his testimony was nothing more than one possible framework for understanding anything, and that the jury was free to disregard that opinion. Now, the defendants say that the foundation that the government elicited was insufficient. Our brief goes through a number of those examples and sets out the very substantial foundation that the district court required before admitting any opinion. The defendants argue that the government's brief cherry-picked the best examples where there was lots of foundation. But in fact, the government's brief is responsive to the defendants' brief and actually it gives the examples that the defendant used. Even the examples that the defendants highlight do not prove their point. To take one example, in the reply brief at page 6, defendants claim that Feeney repeatedly testified that his opinions were based on the investigation as a whole, making it too general for cross-examination. They cite J.E.R. 1398. At that portion of the record, Feeney gives the foundation for some of his opinions, not by referring to his investigation as a whole, but by referring to earlier testimony in the case in which he had already given a full and specific basis for his opinion. So at that page, Feeney testifies that a reference to cleats and gloves in a phone call means drugs. He referred to his earlier testimony as the foundation for that. That earlier testimony was very specific about why he associated sports terms with drug trafficking, and we discussed that at our brief at page 43. So if you go through each one of the examples the defendants list as objectionable, you'll find that there's actually foundation for each one. Regardless, even if some of this testimony should not have been admitted as lay, there was no prejudice. First, the failure to recognize the witness as an expert is harmless if the record on appeal demonstrates the witness could have been so qualified under federal rule of evidence 702. This court held so in Gadsden. Here the district court stated Feeney was an expert. That's at JER 2218. The rigorous foundation that the district court required before admitting the testimony as lay also ensured that his testimony was reliable. And then there was the jury instruction, which ensured that the jury didn't give too much weight. The testimony was also cumulative. Former gang members Ocampo, Ochoa Gonzalez, Rangel, Bowman, and Jesus Cervantes provided extensive testimony on the history of NF, NF's goals, its rules and regulations, and testified about the violent conduct and the other offense conduct that these defendants participated in. On top of that, gang members testified about the code. Ocampo and Rangel talked about the general principles that gang members were referred to using female names, that they communicated in the third person, that they sent emails using an intermediary, a piggyback. That provided a tool for decoding much of the calls and letters that were brought before the jury. The cooperators identified the major gang nicknames for the defendants. We discussed that at pages 64 to 65 of our brief. Rangel testified the terms related to sports teams and restaurants were codes for drug trafficking. All of that evidence shows that Feeney's testimony was both properly admitted and did not cause any error. Unless the crowd has any questions, I'll turn to the obstruction issue. Defendants' sole challenge to the sufficiency of the evidence is on the nexus requirement. In addition to the heinousness of the crime and the heinousness and extreme nature of the cover-up, there are two factors that make this case really easy for this court. First, at the time of the murders, the defendants knew they were already under law enforcement investigation. That was a key factor in both indictments. Excuse me. Hello. Is that true for Jaime as well as Henry? Yes. It would be an inference for Jaime. For Henry, there is testimony that he knew a pole camera I understand that. That's why I'm asking about Jaime. What is the evidence that he knew that he was under investigation? It wouldn't have been the evidence that Jaime didn't know that he was necessarily under investigation. He knew that he was living in an apartment building with Henry. Henry knew he was under investigation. There were a number of other NF members recently released from prison, like Rangel. He knew that he was living and working with high-level gang members that had recently been released from prison. Henry knew that he actually was under investigation. All that together would permit the jury to infer that Jaime also knew that, as a group, they were under investigation. What are your other things you're relying on? In addition to the fact that they knew that they were under law enforcement investigation, the defendants had training and experience with the criminal justice system, including indictments. Henry had been indicted, imprisoned, and was on supervised release, as we already discussed. Jaime was living in that apartment building. But Jaime, Henry, it seems clear, had a lot of experience. He was not a street criminal, just a street criminal. He was a member of the federal faction of the Nuestra Familia. Not just the state, but the federal faction. Andrew was one of the leaders of the federal faction. So while it doesn't matter of the 1512 G's. Excuse me. What was Jaime's level of knowledge from his own experience, which was quite a bit less extensive with law enforcement up until this time? Right. He had just finished extensive training with Larris, where he had been trained on the history of NF for several hours a day, four months. And that's a JER 704. So we know whether that training included, did that include knowledge that there would be investigations by law enforcement every time they did something criminal? It allowed the jury to infer that they were targets, that they knew that they were targets. The training included a lot of history on NF and on past indictments. It mentioned the Black Widow indictment, which was a huge federal indictment of former NF members, including Henry and Larris. Along with, in that shoebox of material that was underneath Jaime's bed, there was a detailed test of different aspects of gang membership, including test questions and answers on the Black Widow indictment. There were newspaper articles about the Black Widow indictment and mentioning Henry. So Jaime would have known that Henry, as this high-level carnal recently released from federal prison, who had just committed this murder, would have been a target, a bullseye for the FBI. And so when Henry then ordered him to do the cleanup, Jaime, as well as Henry, would have known that there would have been a grand jury investigation. Certainly it was a reasonable inference that the jury could have made. Unless the court has other questions, well, actually, I would just like to address the cases quickly. Henry primarily relies on Aguilar and the recent Fourth Circuit decision in Young to make their argument. Those cases are easily distinguishable. There, the courts found that simply making false statements to a law enforcement officer or third party who may or may not testify before a grand jury at some point was not sufficient to show a nexus to a grand jury proceeding. Young specifically said that it was relying on that aspect of Aguilar. It said the evidence is insufficient for largely the same reasons it was not insufficient in Aguilar. That's very different than what happened here. This involved a double murder and the burning of bodies. The defendants were not just conveying false information to a third party who may or may not provide information to the grand jury, but they were actually destroying the corpus delecti of the crime, the bodies themselves. And they were doing it at a time, not when they thought other people were being investigated, but that Henry was being investigated, that that entire apartment building was under scrutiny. So that's what distinguishes it from those cases. I'd like to turn to Henry's sentencing issue. First, the district court did not violate the Sixth Amendment in using the first degree murder guideline to calculate Henry's sentence. This court has clearly held in cases like Lynch, Berrigan, and Mercado, that a district court may sentence a defendant based on conduct that the jury did not find. Now Henry relies on Pimentel-Lopez to argue that the jury's findings precluded the district court from sentencing based on the murders. But Pimentel-Lopez is a narrow decision that's not applicable here. It seemed like you moved somehow and it affected your sound. There's a problem with the IT. I don't know whether it's at your end or at the court's end, but you've suddenly become garbled. It sounded like you moved something. It may have hit the mic and changed it. Okay. All right. I'm sorry. Is this better, Your Honor? It's much better now. Thank you. Good. Yeah, go ahead. Okay. On Pimentel-Lopez, it's a narrow decision that's not applicable here. In that case, this court found, based on the specific manner in which the verdict form was written, that the jury made an affirmative finding beyond a reasonable doubt that the defendant was responsible only for less than 50 grams of the drugs. And in those circumstances, the court could not sentence the defendant contrary to the jury's finding. At the same time, the court made clear in that case that if the jury merely failed to find a fact under the reasonable doubt standard, the sentencing court remained free to make a finding under a less stringent standard of proof. Mitchell v. Prunty, which they rely on in their reply brief, is the same. Those were affirmative findings beyond a reasonable doubt. And so, in that case, the judge was not supposed to sentence in contradiction of those jury findings. But here, the special finding merely asked, yes or no, whether we, the jury, unanimously find that Henry committed the murders of Washington and Navarette with various states of mind. A negative answer to those special findings does operate as nothing more than a statement of no. The jury could not reach a unanimous decision. And that's a statement consistent with its unequivocal, undecided response to counts five and six, charging vicar murder of those same victims. Under the cases, including Pimentel-Lopez, the jury's verdict did not preclude the district court from making findings on the murder. I'd like to turn now to the clear... Would it make a difference to that argument? I understand the issue about whether or not... There's a terrible sound coming in here. I don't know where it's coming from, but it's really distracting. Is it the movement of the paper, Your Honor? I just moved my paper over. Yeah, it may be because we're back to normal. Judge Collins, go ahead. I will try not to move the paper again. Thank you. I understand, given how it's worded, that technically we don't even know whether they unanimously acquitted versus they just disagreed on the charge. But would it make a difference if they had, in fact, unanimously acquitted, or would the results still be the same? Not if they unanimously acquitted, no. Under Lynch, Mercado, an acquittal is not the same as an affirmative finding of innocence. Pimentel-Lopez is about a unanimous affirmative finding of innocence, not just an acquittal. An acquittal is simply, we unanimously agree that the government didn't meet its burden. Those two things are different. It didn't meet either standard here. It didn't meet the Pimentel-Lopez standard. Turning to the application of the clear and convincing standard of proof, Henry has to satisfy all four prongs of the plain error standard to obtain relief, because he did not contest the burden of proof below. So this court need not resolve the first two prongs, whether there was clear or obvious error, because Henry is unable to satisfy the third and fourth prongs, and therefore is not entitled to relief. And this court could look to Gonzalez and United States versus Technic Services for that principle. Looking first at the third prong, the prejudice requirement, defendant fails to show prejudice. In making his prejudice argument about why the burden of proof mattered, Henry only makes arguments about the type of homicide that he committed, whether it was first degree, second degree, or manslaughter. You could look at his brief, his opening brief at page 28, or his reply brief at page 17, to see that. He did not argue that the burden of proof mattered with respect to whether there was a connection between the murders and the RICO conspiracy. So in deciding prejudice, that issue was not before this court. But there was in fact abundant record support, both in the district court statements and in the actual evidence, that the murders were connected to the RICO conspiracy. As far as the district court statements, showing that it would have made the finding that the murders were connected, even under a higher standard. The evidence more than meets the standard for relevance. You're making the noise again, so let's try again. Yeah, so I didn't, I apologize, Your Honor. I didn't move anything at the time, but I do apologize. If no apology is needed, we're all struggling with the technology, but we just want to be able to hear your argument. So the district court statements that would have made it clear that it was connected to the conspiracy and the murder, even under a higher standard. First, J.E.R. 212, where the court says, the evidence more than meets the standard for relevant conduct. Again, at J.E.R. 151, the court says, logically, it doesn't make sense to me to not consider the murders as part of the RICO conspiracy. And then at J.E.R. 234, the court says, it would be incomprehensible in light of what we were doing, and not at all logical, given what the purpose of the RICO count was intended to be. Now, the record evidence supports the district court statements, and abundantly shows that Henry committed the murders in compliance with NF's Code of Conduct. We actually make this argument at government briefs, at 95 to 96. It matches the Polaris deficiency argument. You're making, somebody is making the sound again. I don't know whether it's you, but try again. The government's brief at pages 95 to 96 makes argument about the abundance of evidence showing the connection between the murders and the RICO conspiracy. Bond 4 of the 14 bonds of the NF Code is that an NF member's blood family must be respected and protected. Rangel testified that a gang member who does not retaliate after an attack on family would be viewed as weak and a coward, and would lose respect and power. That's at J.E.R. 2379. Ocampo testified that a gang member fails to retaliate against those who harm his family. This is a quote. Most likely the NF going to come after you. J.E.R. 2040. So this is record evidence that supports the district court's statements that there was lots of evidence connecting the murders to the RICO conspiracy. Separately, there's the question of whether the court would have found first degree murder under a higher standard. And it's important to realize that if the court had found either first degree or second degree murder, it wouldn't have changed the guidelines. The district court's statements, once again, show that the standard of proof did not matter to its sentencing. The court said, there's not any doubt in my mind that you committed those acts. It said on that same page. It found all of the evidence on Henry's background. This is J.E.R. 212, again, Joint Excerpts of Record 212. It found all of the evidence on Henry's background and capacity, and whether or not it was diminished, to be unconvincing. At J.E.R. 234, the court said, the question that I am faced with is whether you can be trusted to operate outside of prison walls. And my ultimate conclusion was that you can't. So he did not satisfy the third prong of plain error review. And for the same reason, he can't satisfy the fourth prong either. He's made no showing that this court should exercise its discretion to protect the fairness and integrity of the proceeding by remanding for new findings. And I just want to say that there's a real cost to sentencing remands when you're talking about a violent gang member like Henry. It's expensive, and it's dangerous logistically to move them. One of the things that sentencing goes into the government... Excuse me. Why is that something, if there's error, there's error? So the policy argument that you're making seems not pertinent. This is Jess. This court should rigorously apply the plain error standard. Absolutely, if there's error, the case needs to be remanded. But the court should look at it closely and apply all four prongs. That's the only argument the government is making. I'd like to turn now to the Jaime sentencing issue. I'm going to move some pieces of paper, but I won't talk. We agree that there was an error in the calculations. As we've laid out in our brief, there was two errors, and if you do the right calculations, it's correct. Quickly, Jaime argues not to remand because the entire calculation changed. But that is an unpersuasive argument in a plain error case. In a plain error case, it's the defendant's burden to show a reasonable probability of a different outcome. Here, it's not a matter of the exercise of discretion. The court made all the findings. It found first degree murder. And if it found second degree murder, it wouldn't matter to any of the calculations. So on the facts here, we know what the district court would have found. There shouldn't be a remand. Unless the court has any questions, we'll wrap up. Well, but you... I mean, we're going to recalculate. I understand it's plain error, but we're going to recalculate the countervailing error that you want to say offsets the other error, even though there's no cross appeal. Why wouldn't we just, given that there's a concession, that there was a clear error, just send this back, and the district court can sort this all out? And maybe you're right that it won't make a difference, but why shouldn't we just send it back? Well, I'm... We're not asking for affirmative relief. We're asking for the court to simply keep the status quo, affirm the sentence. So we're allowed to defend based on... But you acknowledge that there's an error built... There is an error built into how we got to the status quo, but now you want to put on the other side of the ledger another error that, you know, otherwise was never raised below either. Yes, and we think that under the... That's the correct application of the plain error standard. The court's statement... Rebalancing would not have mattered to it. It found Jaime's acts of violence horrific. It said you poured gasoline on someone and lit them and burned them to a crisp. You terrorized older women, those women you robbed. You stabbed a man so badly that he stayed in the hospital for over a month, and you have a lack of any remorse whatsoever. You just time and time again committed these acts of violence without any regard for human life. Finally, the court said Jaime gave the court no hook, no hope that he wanted to change or that he intended to change. We think if the court looks at all the factors of plain error... How vile Jaime's conduct was, the defendants can't meet their burden of showing that there would be a change in the sentence. Thank you, Your Honors. We will hear rebuttal from whoever is intending to do it. With regard, I'm going to only speak about Jaime. The government said that Jaime should have known about the grand jury because he was living with other NF members. That requires a leap of logic which really doesn't make much sense. It's based totally on the circumstances. There was more to it than that. As I understood it, the materials that he possessed had information about other grand jury proceedings, so he would have been familiar with that and their relevance to this gang. I'm not sure he would have been familiar because those were materials that were found under his bed. There was no showing that he had a reading comprehension that he could understand those. I took a look at those. I reread those exhibits last night. They are in microscopic handwriting, block handwriting, and the mention of indictment or grand jury is you have to look through pages and pages and pages. These are additional arguments on top of the argument that if you burn the corpus delicti in a double homicide, you are destroying the key item of evidence in an extremely serious crime, and you have to expect that that's going to land in an official proceeding. This isn't like Aguilar. I understand. I'm not downplaying the heinousness of what happened. What I'm focusing on is the legal question of whether a federal grand jury, which was the official proceeding and the theory of the government, whether that was foreseeable as to Jaime Cervantes. That's a different question than how bad the crime was and whether it was going to be investigated by the FBI or the Oakland police or somebody else. The question is, and again going back to that litany of cases that I've cited, Aguilar, Fowler, Maranello, Arthur Anderson, it always requires more than just something. I mean, destroying documents in the Enron investigation is very serious. Tipping off a suspect and lying to a FBI agent, as Judge Aguilar did, is very, very serious, but the Supreme Court has consistently found that that was insufficient. I want to thank the Court, on behalf of all counsel, for your patience and for rescheduling this argument. Well, I just want to clarify. You go back to we don't know whether or not they're going to be in Oakland. Are you pursuing that it has to be a federal grand jury or that you can have a preliminary hearing in the state court and the statute still applies? No, a federal grand jury has to be foreseeable. Where do you get that? A federal grand jury, isn't it a criminal proceeding? No, it talks about an official proceeding. But I read you the language from Gee, which says that you don't have to know that it's going to be federal. Well, correct, but then the other cases, the other circuits, which have addressed that precise question, have said, in Frisky and Young, that yes, that's true, but it still has to be some element of foreseeability of a federal proceeding. In other words, it's an objective test. It's not a question of, in other words, when your Honor read from Subsection G and it was talking about the mens rea or the intention of a federal versus state proceeding, that's a different question. The objective question here is whether a court can say that an obstruction or impedance of a federal proceeding should have been contemplated by the defendant. Whether or not, in his head, he thought it was federal or state. Thank you, Counsel. I think we understand your argument on that point. Just quickly, Your Honor, I'd like to address Henry's sentencing, particularly plain error. The first thing I wanted to point out is that the requirement of using clear and convincing evidence is well established. The error is obvious. The government has argued that, essentially, he can't meet the substantial rights test, but we just don't know that. Yes, the judge was concerned with what he did. The judge expressed a lot of displeasure with his actions, but that doesn't mean that she would have used first-degree murder under the circumstances. It's a significantly higher standard of proof between preponderance and clear and convincing. The other thing is that the bottom line is that the way the court sentenced the defendant is that he got acquitted of nothing and was convicted of everything. This is very troubling. The jury acquitted him. Even the government, in its brief, suggested that the basis for acquittal was that the conspiracy to commit murder wasn't... The murders weren't part of the RICO conspiracy. I may agree with you on that, that it's very troubling that this is how the Sixth Amendment works after Booker, that you can have something like what happened here, but Mercado seems not distinguishable. The other counts were all unanimous acquittals, and yet they were sentenced as if they were convicted on those counts, on the count of conviction. How do you get around that? If you go back and you look at Mitchell v. Prunty, it's not that different. In that case, and this was a habeas, so it's a different procedural posture, but the jury acquitted him of driving the car that killed the victim, and then the court itself found there was insufficient evidence on the other counts. So essentially... And then Pimentel-Lopez is not as narrow as the government would like it to be. These cases have modified Mercado. I would also add... Well, I understand what you're saying, and I mean, of course, there is an issue that... I mean, this is an issue that's percolating in the courts, but nonetheless, I think it's important to look at the special verdict that the government drafted. One of the things it says is, conspiracy to commit murder with malice of forethought. Malice of forethought is a necessity for first-degree or second-degree murder. So if the jury has acquitted him of this, how then can we base it on first-degree murder, especially when there's a clearly applicable guideline, which is 2J1.2, where I may be mis-citing it, but the obstruction of justice guideline, which he could have been sentenced on, has a clear cross-reference to murder. And under that guideline, even if the court did find it was first-degree murder, it would have been capped at 30. That's how those guidelines should have been calculated. Thank you, counsel. Thank you, Your Honor. We appreciate the arguments from all of you, even though there were some IT glitches. It was very helpful on the part of all of you. We appreciate it very much, and the case just argued is submitted, and we stand adjourned for today's session. Thank you.
judges: Wallace, Graber, Collins